**Mary W. GROVES et al.**

v.

**David A. WITHERSPOON.**

**Civ. A. No. 8432.**

United States District Court,
E. D. Tennessee, N. D.

April 16, 1974.

---

**54**

E. Bruce Foster, Knoxville, Tenn., for plaintiffs.

W. E. Michael, Sweetwater, Tenn., William B. Felknor, Maryville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This is an action to clear the title of plaintiffs to certain valuable real property located in Knoxville, Knox County, Tennessee. Jurisdiction is based upon diversity of citizenship. Title 28 U.S.C. § 1332.

Plaintiffs, niece and nephews of the defendant, David A. Witherspoon (David), contend that they were never made parties to an action originally filed in July 1965 by David in the Chancery Court of Knox County, Tennessee to foreclose an alleged vendor's lien on the property in that they were never given sufficient notice under the Due Process Clause of the Federal Constitution of the pendency of the action. In the alternative, they argue that even if sufficient notice was given, David committed both extrinsic and intrinsic fraud, by causing the alleged lien to be foreclosed and the property sold at public auction to the highest bidder, so as to render the decree of the Chancery Court and the sale an absolute nullity.

Plaintiffs say that in 1957 their grandmother conveyed to their father, Thomas P. Witherspoon, Jr. (Thomas), and themselves, as tenants in common, some 15.6 acres of land which now lies in close proximity to I–75. Further, they allege that defendant, David Witherspoon, their uncle, succeeded to Thomas' interest under the will of Thomas. Thereafter, they claim that David caused an action to be brought in the Chancery Court for Knox County, Tennessee styled David A. Witherspoon v. Thomas P. Witherspoon, Jr., et al, No. 43838 (hereafter called the Chancery action), for the purpose of foreclosing on a vendor's lien securing five promissory notes which had been assigned to David by his mother, Etta F. Witherspoon (Etta).

Plaintiffs say that notwithstanding David's knowledge of their whereabouts in Florida, including their precise address, no such information was stated in the original bill in the Chancery action and no record appears of any attempts to give them, as party defendants, notice of the pendency of the action by any means other than publication in a paper which appears to the Court to be of restrictive circulation.

In the alternative, they say that David, by various means, committed a fraud upon them and the Chancery Court by causing to be entered a default judgment and subsequently causing the property to be sold for $15,000.00 to Robert Marshall who, as a strawman, later conveyed the property to David in fee.

As to the defendant Cumberland Capital Corporation (Cumberland Capital), plaintiffs say that it, as the holder of a deed of trust made by David to secure certain loans, occupies no greater position in such property as was held by its

mortgagor, David Witherspoon. Additionally, it is alleged that a thorough and adequate search of the title and examination of the record would, or should, have disclosed the fact that the sale pursuant to the Chancery decree (1) was not in compliance with due process and therefore void, and (2) bore indicia of fraud so as to put it on notice of alleged defects in the chain of title.

Defendant, David Witherspoon, denies that any fraud was committed either upon the Chancery Court or upon these plaintiffs. He says that he was the assignee of certain notes executed by Thomas to his mother and the assignee of his mother's equitable lien upon the property. His adverse interest, therefore, was made apparent in 1965 when he sought to foreclose on the notes and lien, or some two years prior to his succeeding to Thomas' interest in the property as the sole devisee under the will of Thomas. David further claims that he breached no fiduciary duty owed to plaintiffs in causing the property to be sold, and asserts that plaintiffs had actual notice of the Chancery litigation and did not contest such until they discovered that the value of the property had markedly increased due to its proximity to Interstate Highway I-75. He says further that the Chancery Court proceeding was valid on its face and pleads such decree as a bar to this action.

It is the position of defendants Dance, as Trustee, and Cumberland Capital, that Cumberland Capital was a good faith purchaser of David Witherspoon without notice of any defect in title. It is stated that even the most thorough search of the title and records would not have disclosed the defects here alleged, and that to divest their title would disrupt all concepts of property and title law.

Despite a prolonged trial on the merits during which the issues appeared to become prolix, the basic issues presented in this action are: (1) Did plaintiffs have notice comporting with due process of the Chancery proceeding so as to bind them thereto? (2) Did David Witherspoon perpetrate a fraud upon the state court and these plaintiffs so as to vitiate its decrees and the sale of the disputed property; and (3) Is defendant, Cumberland Capital, a purchaser in good faith for value without notice of any defect in title?

### Summary of Evidence and Findings

Mrs. Etta F. Witherspoon (Etta) was the mother of four children, Amy, Thomas P., Jr., David and Jack. Thomas P. Witherspoon, Jr. (Thomas), who died in 1967, was the father of the plaintiffs.

While it is disputed by the defendant, Cumberland Capital, it appears that Thomas was declared incompetent and placed under the guardianship of his father, Thomas, Sr., in 1946. David testified that this was done for the purpose of enabling Thomas to receive some kind of disability insurance. It is clear from the documentary evidence (Exhibit # 3) that David replaced Thomas, Sr. as guardian in June 1957, or a short period of time after the demise of Thomas, Sr.

David testified that the first step that he took regarding the guardianship was to have the disability removed. However, as shown by the exhibits, this did not occur until the County Court for Knox County, Tennessee ordered the restoration of Thomas, Jr.'s sanity in August of 1957. (Exhibit # 3).

This sequence of events, while not controlling, is important because it was during this period of time, namely July 1, 1957, that Etta deeded to Thomas, Jr. and the three plaintiffs, as tenants in common, the 15.6 acres involved in this litigation. Additionally, on the same date Thomas, Jr. allegedly executed five promissory notes in the face amount of $3,000.00, each bearing interest at 6% per annum, in favor of Etta to be retired in one year intervals for a period of five years.

While the parties sharply contest the events occurring in 1957, it appears

from the testimony of Clyde W. Key, Esquire, a reputable attorney, and Miles Seigal, accountant, that the Witherspoon family, at the instance of either David or Etta, or both, desired to make a distribution of Etta's estate before she died. The thrust of these negotiations was to distribute certain parcels of real estate and items of personal property among the four children. In return, the children were to be the makers of promissory notes, payable to Etta, in amounts which would in turn be voluntarily retired by Etta without payment thereon for a successive period of years. Additionally, all notes that Etta retained at her death and which were not otherwise retired were to be cancelled. The purpose of this was to minimize federal estate and gift tax liability on Etta's holdings. The final agreement of the parties was drafted by Mr. Key in a written instrument, which, even though unsigned at that time, bore the date of July 1, 1957. (Exhibit # 58). It is observed that the notes given by Thomas were the only ones that were claimed to have been assigned, although each of the three other children executed notes to Etta. Why Etta would assign Thomas' notes to David and not assign any of her other children's notes is unexplained in the record.

Pursuant to this arrangement, deeds, signed and acknowledged by Etta on the above date, were made to the four children. One of these is the subject of this lawsuit.

█ Despite arguments propounded to the contrary by counsel for the respective defendants, the Court is convinced that the conveyances of July 1, 1957 were intended on the part of Mrs. Etta F. Witherspoon to be gifts to her children, and that the sole purpose of the execution of the promissory notes was to minimize tax liability. Accordingly, it appears that Etta did not have the intention of retaining a vendor's lien for the unpaid balance of the alleged purchase price ($15,000.00) nor did she intend the notes to be evidence of such a lien.

By instrument dated December 31, 1964, David purportedly became the assignee of the five promissory notes, which remained unpaid, and the alleged vendor's lien. Plaintiffs' counsel submits that this assignment was a sham and asks the Court to compare Etta's signatures on the notes with that on the assignment. We have not had sufficient experience in the examination of documents to reach a satisfactory conclusion from such comparison of the notes alone. However, the circumstances, namely, the taking of the assignment by David of promissory notes executed by Thomas at a time when Thomas was under David's guardianship creates some suspicion, especially where David was a party to the family agreement of 1957 and understood the arrangements that had been made. Additionally, the Court has doubts concerning the purported assignment of these notes to David notwithstanding the testimony of James Rimmer who stated in substance that if he acknowledged, as a notary public, Etta's signature on the date of the transfer then that was when such transfer occurred.

David testified that it was his understanding that Thomas was competent at the time he executed these notes, and further that it was the intention of Etta to have retained a vendor's lien on the property conveyed to plaintiffs and their father so that she would be provided for in her old age. He also stated that it was upon Thomas' continued failure to pay the notes and because David had carried the burden of providing for Etta in her aging years that Etta assigned these notes to him in consideration of those services. While it may be true that David cared for his mother and expended subtantial sums for her support, the record, as indicated, does not support his claim that at the time she executed the deed Etta intended to retain a vendor's lien or enforce the promissory notes.

In June 1965, David instituted an attachment action in the Chancery Court to enforce the alleged vendor's lien and foreclose on the promissory notes. The

plaintiffs here were made parties to that action, but the original bill shows, and Charles Rader, Esquire, then attorney for David, testified that the addresses of the children who had lived in Jacksonville, Florida for most, if not all, of their lives, were never stated. Additionally, the proof shows, and the Court finds, that David Witherspoon knew or, through diligence, could have discovered the actual addresses of these then party defendants.

In the spring of 1967, Thomas, Jr. died and his estate was duly probated by his executor, Jack Witherspoon, Jr., on May 5, 1967. On May 12, 1967, an amended bill was filed in the Chancery action making the executor of Thomas' estate a substituted party defendant. Again, however, plaintiffs contend that no notice was ever given them.

There was much testimony regarding this notice issue. Jack Witherspoon said that he advised them not only of the existence of the notes but also of the Chancery action. David Witherspoon likewise said that he told them of these facts. Plaintiffs, however, stated that none of them were aware of the alleged notes, the Chancery action or that the ownership of the property rested in David until their present counsel, pursuant to their request, discovered the facts upon which this litigation is based.

Additionally, Mr. Rader testified, and Exhibit No. 19 shows, that a letter from him to plaintiffs was written on May 22, 1967 advising them of David's position concerning the promissory notes and the pendency of the Chancery action. However, Mr. Rader could not state whether such letter was ever actually mailed. He could only testify that a copy of the letter was found in his file on the Witherspoon lawsuit.

Consequently, in order to find that plaintiffs had actual notice through this letter, we would be required to base one inference on another inference, namely, that the letter was mailed and received in due course. It is not proper to base one inference on another inference in order to reach a conclusion. Moreover, each plaintiff testified that he or she did not receive the letter.

On August 18, 1967, a default judgment was taken against these plaintiffs in the Chancery action and on August 22, 1967 a sale of the property was ordered.

Mr. Robert C. Marshall testified that on September 21, 1967 he was the highest bidder at the auction. He further testified that he was first informed of the sale by David who then explained his interest in the property and his desire not to be personally involved in the possible bidding against his nephews and niece. Marshall stated that it was at David's request alone that he bid on the property and that during the progress of the sale he was given instructions by David as to how the bidding should proceed.

While the testimony is somewhat conflicting, the evidence shows that there were only two or three bids made. James Rimmer, a former employee of David Witherspoon and the notary public who allegedly witnessed Etta's signature to the assignment of the notes, testified that he opened the bidding at $12,000.00 and recalled that there were other bids between his figure and the $15,000.00 ultimately bid by Marshall. Rimmer further stated that he had no prior arrangements with David to buy the property.

Irrespective of this testimony, it is clear that Marshall acted on behalf of David. He had no financial interest in the property and would not have purchased it but for David's request that he do so. The evidence further shows that Marshall received the Clerk and Master's deed on March 15, 1968 and in the same month conveyed the property to David and his wife. Additionally, in November 1967, in his financial statement submitted to Cumberland Capital, David listed as an asset the 15.6 acres in question, and set its value at $600,000.00. (See Exhibit Nos. 8, 9 and 11).

On March 23, 1968, or some eight days after the transfer from Marshall to him, David conveyed the property to defendant Dance, Trustee, as security for loans made by Cumberland Capital. (Exhibit No. 15). In April 1968 a supplemental trust deed was executed making the property security for loans advanced to David Witherspoon, Inc. (Exhibit No. 16). Thereafter, the property, along with other properties, became security for additional loans made by Cumberland Capital. (See Collective Exhibit No. 17).

The Court concludes from the evidence (1) that David Witherspoon had the desire to acquire all the interest in the land herein involved; (2) that in 1967 he had valued it as his own asset in the amount of $600,000.00; (3) that he, through the use of a third party, strawman, purchased the property at a court sale for $15,000.00; and (4) that he then mortgaged it for substantial sums of money advanced by Cumberland Capital.

All of these activities were accomplished without fully advising plaintiffs, who were tenants in common with David for some time prior to the actual conveyance by court decree, of his true intentions to acquire the property for his exclusive use. We are aware that David did offer plaintiffs, in the summer of 1967, $500.00 each for their respective interests. However, at no time were the full facts regarding his involvement with the property ever explained to them. In connection with the value placed on the property, two real estate men testified. It is noted that David himself placed a value on the property in his 1967 financial statement prepared in expectation of receiving a loan. It is recognized that real estate values are illusive and about which many people hold divergent views. While the figure of $600,000.00 appears high, it illustrates the fact that the value of 15.6 acres, more or less, was far in excess of the $15,000.00 paid by Mr. Marshall, the strawman.

During cross-examination of the witnesses, Rader, Jack Witherspoon and David Witherspoon, it developed that although Thomas apparently owed the balance on these alleged promissory notes, and even though a certain parcel of land was conveyed by the executor to David, no credit was ever given the estate as against the balance owing or in favor of the plaintiffs for their respective shares in the property. Further, plaintiffs showed that the unused balance of a fund set aside for funeral expenses of Thomas was not credited against any debts Thomas owed. While Mr. Rader testified that a suggestion of insolvency would have been ineffectual in protecting plaintiffs, the proof shows that Jack Witherspoon, as the Executor of Thomas' estate, and David worked very closely in settling the estate's accounts. We recognize that this alone would not be sufficient to show fraud, but such facts further illustrate the degree of involvement and control that David maintained over the distribution of his brother's property. Additionally, the evidence clearly shows that these plaintiffs, whether by choice or not, never became involved in the settling of their father's estate.

### Analysis of Cases and Conclusions

As heretofore stated, plaintiffs have filed this collateral action to set aside a prior state Chancery Court decree and deed executed pursuant thereto and assert two grounds for relief. First, they say that the Chancery decree was void in that they were never given notice comporting with due process of the Chancery action. Secondly, they argue that fraud, both extrinsic and intrinsic, was committed in the state court proceedings, and that such fraud renders the decree and sale void and, therefore, subject to collateral attack in this Court.

It appears well settled that a fundamental requirement of due process requires that notice, reasonably calculated to apprise those involved of the pendency of the action and further calculated to afford them an opportunity to

present their claims or objections, be given to the parties to a lawsuit. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed. 2d 178 (1956); Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962). While the cases recognize that service or notice by publication may be a reliable means of giving notice, it may not, under the circumstances of a particular factual situation be sufficient to comport with Constitutional standards. See e. g. *Mullane*, supra. That is to say that all reasonable efforts of giving actual notice should be first exhausted before publication is resorted to.

In the case under consideration, the evidence showed that at the time David Witherspoon instituted the Chancery action he was not only aware of plaintiffs' interest in the property that was the subject of the litigation but knew, or with reasonable efforts could have discovered, the precise address of these children. This information was not given David's attorney and the evidence reflects that none of the pleadings attempted to disclose their location. While David testified that he discussed the matter with them, plaintiffs stated that they were never aware of the pendency of the Chancery case or of their interests in the property.

The only evidence mitigating plaintiffs' assertions appears in a copy of the letter of Mr. Rader dated May 22, 1967 in which Mr. Rader advises plaintiffs of the circumstances surrounding the attachment action. This would have constituted actual notice to plaintiffs. However, Mr. Rader could not testify that the letter was actually sent, nor does the record give any indication of such. Thus, the Court would be required to presume not only that since the letter was found in Mr. Rader's files it was duly mailed but also that plaintiffs received the letter in due course. The Court, as stated, cannot indulge in this double inference, and cannot say that this was reasonably calculated to give actual notice.

Accordingly, we conclude that under the facts of this case plaintiffs were not given notice comporting with due process. *Mullane,* supra. That is not to say that the method employed, namely, publication under the applicable Tennessee statutes in the *Knoxville Independent* could not in all cases withstand constitutional scrutiny. That issue is not before us. It is to say, however, that where a party plaintiff knew of the interests held by adverse parties and further knew, or could have discovered through reasonable efforts of inquiry, the addresses of certain named defendants but nevertheless failed to take steps reasonably calculated to give notice of the pendency of the litigation other than by publication, such action would not comport with procedural due process. Thus, any judgment, decree, or order entered pursuant to such action would be void and subject to collateral attack. See also, Bass v. Hoagland, 172 F.2d 205 (5th Cir. 1949).

Assuming, arguendo, that plaintiffs were properly made parties defendant to the Chancery action, we turn to the issue of fraud. If fraud of such a nature was committed by defendant, David Witherspoon, as would render the Chancery action a sham or would shock the conscience of a court, the decree must be set aside. This is a diversity action, and the law of Tennessee controls.

In the landmark case of New York Life Insurance Company v. Nashville Trust Company, 200 Tenn. 513, 292 S.W.2d 749 (1956), Mr. Justice Burnett held that fraud vitiates and avoids all human transactions, from the solemn judgment of a court to a private contract. A distinction was made, however, between extrinsic fraud which renders a judgment, decree, order or agreement void and therefore subject to collateral attack and intrinsic fraud which, if not remedied on appeal, is not grounds for equitable collateral relief.

It is said that fraud upon the Court, or fraud which induces an adversary to withdraw his defense or prevents him from presenting an available defense, is the type which equity will relieve. *Nashville Trust Company*, supra, at p. 519, 292 S.W.2d 749. Additionally, a court may set aside a judgment where it appears that such is manifestly unconscionable.

However, where fraud is by its nature intrinsic and where the parties have available to them some corrective appellate process, then such would not render the judgment void but only voidable. In that case, collateral equitable relief would not be available.

In a more recent case, the Tennessee Court of Appeals stated that some examples of extrinsic fraud are (1) keeping the unsuccessful party away from court by false promise or compromise, and (2) purposely keeping him in ignorance of the suit. Henley v. Hastings, 59 Tenn. App. 427, 441, 441 S.W.2d 64 (W.S. 1968).

In his argument to the Court, plaintiffs' counsel suggested several items which he believes are indicia of fraud committed by David upon his niece and nephews, namely: (1) that David knew his brother to be incompetent on the dates the notes were signed and that notwithstanding the confidential relationship he enjoyed with Thomas at that time, later became the assignor of these notes; (2) that David participated in the agreement of July 1, 1957 and knew that the notes were made as a part of a plan to divide and distribute the estate of Etta Witherspoon so as to minimize potential federal estate and gift taxes and that no equitable lien was intended to have been retained by Etta in the transfer of the 15.6 acres; (3) that David became a tenant in common with these plaintiffs in 1967 and, therefore, under the laws of Tennessee could not, either directly or indirectly, purchase the property for himself at a judicial sale without becoming a constructive trustee for the benefit of the other co-tenants; (4) that no attempt was made by David to fully notify and inform plaintiffs of his claimed adverse interest in the property or of the pendency of the Chancery action even though he had ample opportunity to do so when they were in the Knoxville area, and, further, that he attempted to purchase their interest for a patently low price without informing them of the true value of the property; (5) that David, either directly or indirectly, managed the administration of Thomas' estate, purchased from it one parcel and received insurance proceeds set aside for funeral expenses without seeing that any excess amounts were credited toward the estate's debts; (6) that David obtained title to the property which he later conveyed into trust by using a strawman.

Counsel for David, both at argument and in his post-trial brief, takes a contrary view of the evidence. He says that plaintiffs cannot prevail because (1) the Chancery decree and sale is valid on its face and upon its record; (2) that Thomas, though he survived some twenty months after being served with process in the Chancery action, made no defense thereto; (3) that plaintiffs were fully informed of the pendency of the action by statutory publication, in person by Jack L. Witherspoon and David, and by Mr. Rader, and further that they consulted with Florida counsel regarding the death of their father, but nevertheless made no defense to the action; (4) that plaintiffs are guilty of laches; (5) that they are likewise barred by T.C.A. §§ 23–661 to 23–663 and § 23–309 and (6) that plaintiffs do not come into court with clean hands but seek unjust enrichment at the expense of defendants.

Defendant, Cumberland Capital, asserts that the evidence shows it to be a good faith purchaser for value without actual or constructive knowledge of the alleged defects, if such defects in fact exist. It, too, relies upon the defenses of estoppel, laches, and the statute of limitations asserted by counsel for David Witherspoon. Cumberland Capital

further asserts that since Exhibit No. 3 is not a complete record of the insanity proceedings against Thomas it is not admissible as evidence of Thomas' insanity at the time he executed the five promissory notes. However, since that evidence is not alone determinative and was received to rebut the testimony of David concerning Thomas' insanity, the objection is not well taken.

Additionally, while the defenses of laches, estoppel, unjust enrichment and statutory periods of limitation have their places in the law of equity, we are of the opinion that they are not applicable to the case under consideration.

We are aware of the ramifications inherent in the relief plaintiffs request here, and recognize the appeal contained in the argument of counsel for the defendant mortgage company, having had some experience in title work. Under the laws of Tennessee, a presumption of regularity and fairness attaches to final judgments and decrees of the courts and the recitals of such are to be taken as true. However, where the record shows to the contrary or where fraud vitiates the judgment or decree then it cannot stand. See *Nashville Trust Company*, supra; Davis v. Davis, 190 Tenn. 561, 230 S.W.2d 1002 (1950); Davis v. Reaves, 75 Tenn. 585 (1881).

Additionally, fraud is never presumed and must be proved by clear and cogent evidence except where a fiduciary relationship exists between the parties. See Turner v. Bell, 198 Tenn. 232, 279 S.W.2d 71 (1955); McCartney v. Gamble, 184 Tenn. 243, 198 S.W.2d 552 (1947); Williams v. Jones, 54 Tenn.App. 189, 388 S.W.2d 665 (1963).

While the proof in this case is both complex and conflicting, the totality of circumstances clearly indicates to the Court that the defendant, David Witherspoon, perpetrated a fraud on these plaintiffs and upon the Chancery Court for Knox County, Tennessee. He was a party to the 1957 family agreement by which Etta Witherspoon's property was divided and future tax liabilities minimized. He was the guardian of his brother Thomas at the time the five promissory notes which were the basis of the Chancery action were executed. He knew, or at least understood, the true value of the property but at no time did he fully disclose this to plaintiffs or disclose his purported adverse interest even when ample opportunity was presented. He bought the property for $15,000.00 when he knew that its true value was far in excess of that sum.

David further caused the property to be subjected to an attachment action with a view toward purchasing it through a strawman, and in turn used it as security for substantial loans. During this period he knew or could have discovered plaintiffs' actual addresses so as to give them notice of the action but failed to do so. After becoming a tenant in common with plaintiffs he nevertheless failed to protect their rights but to the contrary made efforts to effectively divest them of their three-fourths interest in the property.

Because of these stated circumstances, and upon the record as a whole, the Court is constrained to find in favor of plaintiffs in their action against David and accordingly must declare void and set aside the default decree of the Chancery Court for Knox County, Tennessee, and the sale made pursuant thereto.

With respect to Cumberland Capital Corporation, who asserts that it is a *bona fide* purchaser of the property, we hold that it could obtain no better title than was passed to its mortgagor.

If the title executed pursuant to the Chancery action was merely voidable, or contained some other latent defect which was outside this defendant's chain of title of which it had no actual or constructive notice, then Cumberland Capital's argument could rest on a sound foundation. See e. g. Strong v. Efficiency Apartment Corporation, 159 Tenn. 337, 17 S.W.2d 1 (1929).

Here, however, the title purportedly passed by the Chancery Court to Marshall, then to David and finally to

this defendant was rendered void by David's fraud and not merely voidable. If the instrument purporting to convey title is absolutely void then it is void as to any of those claiming under it. See Swan v. Castleman, 63 Tenn. 257 (1874). It is for this reason that Cumberland Capital cannot prevail in its defense. See also Cannon Mills, Inc. v. Spivey, 208 Tenn. 419, 346 S.W.2d 266 (1961); Obion Valley Land Investment Co. v. Southern General Life Co., 174 Tenn. 353, 125 S.W.2d 482 (1939); Middle Tennessee Bank v. McKennon, 20 Tenn. App. 416, 99 S.W.2d 564 (1936).

In summary, the Court finds and concludes:

(1) Plaintiffs were not given notice comporting with due process of law in the Chancery action. Accordingly, the entire action was void as affecting any interests they might have had in the property involved.

(2) Assuming that notice comporting with due process of law was given, David Witherspoon perpetrated a fraud not only upon these plaintiffs but also upon the state court so as to render any decree or sale pursuant to a decree of that court void.

(3) Cumberland Capital cannot prevail in its defense since the title conveyed to it in trust by David Witherspoon was void.

Accordingly, it is ordered that the decree of the Chancery Court for Knox County, Tennessee and the sale of the property in question pursuant to that decree be, and same hereby is, declared void and set aside.[1] It is further ordered that plaintiffs' three-fourths interest in said real estate be, and same hereby is, cleared of any defect arising out of said state action. As to Cumberland Capital Corporation and Richard Dance, Trustee, it is ordered that all deeds of trust to the extent that they affect the interests of plaintiffs herein de-

clared be, and same hereby are, set aside as a cloud on plaintiffs' title and further that these defendants be, and same hereby are, enjoined from bringing or continuing any legal action which affects the interests herein declared except and to the extent as is allowed by the laws of Tennessee and appropriate judicial processes. As to David A. Witherspoon, it is ordered that he be, and hereby is, enjoined from conveying, encumbering, or otherwise disposing of the property involved in this litigation in derogation of any title as may the plaintiffs possess.

---

1. It is with reluctance that the Court sets aside the Chancery Court's decree and sale, for the doctrine of comity between state and federal courts is a delicate one that should not be easily disturbed. Those who feel aggrieved should in the first instance go to the court where the alleged wrong was committed for relief.